FILED

2020 Dec-17  PM 12:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

| | | |
|---|---|---|
| LAURIE DUDLEY, | ) | |
| | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No. 3:20-cv-00626-HNJ |
| | ) | |
| RICK SINGLETON, et al., | ) | |
| | ) | |
| Defendants | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Laurie Dudley, proceeds as the mother and Administrator of the Estate of Brandon Spann, who died while detained in the Lauderdale County Detention Center.   Dudley's First Amended Complaint asserts Due Process and Equal Protection claims against corrections officers Steven Carlton and David Dison pursuant to 42 U.S.C. § 1983, and claims against Lauderdale County Sheriff Rick Singleton pursuant to Title II of the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA). (*See* Doc. 15).   This memorandum opinion addresses Singleton's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. 24), and Carlton and Dison's Motion to Dismiss pursuant to the same provision.   (Doc. 26).[1]

---

[1] Singleton relies upon Federal Rule of Civil Procedure 12(b)(1), which permits dismissal based upon

As explicated below, qualified immunity protects Carlton and Dison from suit on Dudley's Due Process claim regarding Spann's suicide because they did not possess knowledge of a strong likelihood that Spann would harm himself.   However, Dudley's Due Process claim regarding their delay in responding to Spann's mental health and psychiatric needs plausibly avers a violation of the Due Process Clause pursuant to clearly established law.   Dudley's Equal Protection claim cannot proceed on "class of one" theory because the alleged facts do not indicate Spann was similarly situated to other detainees, and a traditional Equal Protection claim also falters given the lack of averments Carlton and Dison demonstrated animus on the basis of Spann's disability. Accordingly, the court will partially grant Carlton and Dison's motion to dismiss.

In addition, Dudley plausibly stated ADA and RA claims against Singleton in his official capacity due to his employees' alleged failure to accommodate Spann's mental health needs.   Yet she does not have standing to obtain injunctive relief for the alleged violation, and she did not allege deliberate indifference by a high enough official as to the alleged failure to accommodate so as to obtain monetary damages.   Furthermore,

---

a lack of subject matter jurisdiction.   However, Singleton has not alleged any basis for the subject matter jurisdiction challenge, as he seems to beseech the court to locate such a basis. (Doc. 25, at 8). The court has discerned none thus far, but just in case Singleton infers otherwise, qualified immunity is not a jurisdictional issue. *See Nevada v. Hicks*, 533 U.S. 353, 373 (2001) ("There is no authority whatever for the proposition that absolute- and qualified-immunity defenses pertain to the court's jurisdiction . . . ."); *Bogle v. McClure*, 332 F.3d 1347, 1355 n.5 (11ᵗʰ Cir. 2003) ("Qualified immunity is an affirmative defense that may be waived.") (citations omitted).   Furthermore, sovereign immunity pursuant to the Eleventh Amendment constitutes a jurisdictional issue, but "sovereign immunity can be waived . . . ." *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1137 (11ᵗʰ Cir. 2019).   Therefore, in the absence of any other argument, the court will not further assess subject matter jurisdiction.

the court will dismiss any claims that rely upon 42 U.S.C. § 1983 as a vehicle for ADA and RA claims given the existence of adequate remedies under the substantive statutes themselves. Therefore, the court will grant Singleton's motion to dismiss as to disability claims brought under those statutes.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint if it fails to state a claim for which relief may be granted. In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Court revisited the applicable standard governing Rule 12(b)(6) motions to dismiss. First, courts must take note of the elements a plaintiff must plead to state the applicable claims at issue. *Id.* at 675.

After establishing the elements of the claim at issue, the court identifies all well-pleaded, non-conclusory factual allegations in the complaint and assumes their veracity. *Id.* at 679. Well-pleaded factual allegations do not encompass mere "labels and conclusions," legal conclusions, conclusory statements, or formulaic recitations and threadbare recitals of the elements of a cause of action. *Id.* at 678 (citations omitted). In evaluating the sufficiency of a plaintiff's pleadings, the court may draw reasonable inferences in plaintiff's favor. *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005).

Third, a court assesses the complaint's well-pleaded allegations to determine if they state a plausible cause of action based upon the identified claim's elements. *Iqbal*,

556 U.S. at 678.   Plausibility ensues "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and the analysis involves a context-specific task requiring a court "to draw on its judicial experience and common sense."   *Id.* at 678, 679 (citations omitted).   The plausibility standard does not equate to a "probability requirement," yet it requires more than a "mere possibility of misconduct" or factual statements that are "merely consistent with a defendant's liability."   *Id.* at 678, 679 (citations omitted).

## ALLEGATIONS OF DUDLEY'S FIRST AMENDED COMPLAINT

On May 1, 2018, authorities arrested Brandon Spann for a domestic incident and transported him to the Lauderdale County Detention Center, at which he arrived at 3:35 p.m.   (Doc. 15, ¶¶ 7-9).   Spann possessed a small amount of marijuana at the time of the arrest, and unnamed officials placed him in a detoxification cell with other inmates upon his arrival at the Detention Center.   (*Id.* ¶¶ 10, 14).   The Detention Center maintains an incident log that details all incidents and shares important information about the detainees Center personnel guard. (*Id.* ¶¶ 26-27).

Around 5:10 p.m., unnamed corrections officers found Spann in the detoxification cell throwing food and with his shirt off.   (*Id.* ¶ 15).   Missy Smith, the Assistant Jail Administrator, ordered corrections officers to remove Spann from the detoxification cell and place him in a psychiatric restraint chair.   (*Id.* ¶¶ 16-17).   After

4

spending an unspecified amount of time in the restraint chair, Spann returned to the detoxification cell.   (*Id.* ¶ 18).

At 9:53 p.m., corrections officer Anita McDaniel commenced Spann's intake screening.  (Doc. 15, ¶ 19).  When McDaniel asked Spann if he experienced any serious mental health disorders that might require treatment during his detention, Spann responded that he suffered from bipolar disorder, but he did not take any medication for the condition.   (*Id.* ¶¶ 20-23).   McDaniel indicated on the intake form that Spann had a history of severe mental illness, violently opposed authority, and displayed aggression toward others.   (*Id.* ¶¶ 24-25).

At 11:30 p.m., unidentified officers placed Spann in a cell with several other inmates, and within minutes, the other inmates assaulted Spann.   (*Id.* ¶¶ 28-29). corrections officers Chase Windom and Barbara Ray removed a bleeding Spann from the cell and placed him, alone, in an attorney visitation cell.   (*Id.* ¶ 30).   No officers sought immediate medical attention for Spann or provided him bandages for his bleeding wound, yet Windom and Ray logged the assault in the incident log corrections officers used to share information with other officers.   (*Id.* ¶¶ 26-27, 31-33).

More than six hours later, during the morning of May 2, 2018, Kylie Jones, the day shift nurse, examined Spann.   Spann reported that the other inmates dropped him on his face during their altercation, and Jones noted dried blood on Spann's face and a deformity on his nose that needed an x-ray.   Jones ordered that officers should place

Spann in a cell with a camera.   (Doc. 15, ¶¶ 35-37).   The Amended Complaint does not state whether officers immediately placed Spann in a cell with a camera, but it does aver that "[s]everal hours later," Detention Center personnel moved Spann to a cell with no camera.   (*Id.* ¶ 38).   There, Spann told his cellmate, Deak Heath, that he would kill himself before he went back to prison.   (*Id.* ¶¶ 40-41).

On May 4, 2018, at an unspecified hour, Spann kicked on his cell door, and Defendant Steven Carlton, a corrections officer on duty, went to the cell.   Spann told Carlton "he did not feel right, and he needed to get out of his cell."   (*Id.* ¶¶ 45, 47-48). Carlton responded, "As far as I am concerned, you will never come out when I am on duty," and slammed the door shut.   (*Id.* ¶¶ 49-50).

"A little while later, Spann kicked the door again," and Defendant David Dison, another corrections officer on duty, responded.   (*Id.* ¶¶ 46, 51-52).   Spann again stated he did not "feel right," and he needed to leave the cell.   (Doc. 15, ¶ 53).   Like Carlton, Dison told Spann he would not leave the cell while Dison was on duty.   (*Id.* ¶¶ 74, 91). Carlton and Dison did not call the nurse or check on Spann again.   (*Id.* ¶¶ 54-55).   Jail policy allows inmates to leave their cells "for various purposes throughout the day," and Spann had not received any disciplinary sanctions that would prevent him from leaving his cell or accessing health care.   (*Id.* ¶¶ 42-44).

At an unspecified later time on May 4, 2018, corrections officers allowed another inmate, Daniel Odom, who did not suffer a disability and had not asked for help, to

leave his cell.   Odom walked to Spann's cell and found Spann hanging from a bed sheet tied to his bunk.   Odom reported the hanging to Carlton, who cut Spann down but did not immediately provide medical aid because he did not possess a CPR certification. Instead, Carlton summoned other corrections officers to attempt to resuscitate Spann. Officers eventually transported Spann to a hospital, where he died from his hanging. (*Id.* ¶¶ 56-65).

Dudley asserts that Carlton and Dison, in their individual capacities, violated the Due Process Clause of the United States Constitution by failing to provide care for Spann's deteriorating mental health and failing to prevent Spann from harming himself. (*Id.* ¶¶ 78-99).   She asserts that Carlton and Dison violated Spann's Equal Protection rights when they allowed other, non-disabled inmates to leave their cells, but did not allow Spann, who suffered from a mental health disability, to leave his cell to address his mental health.   (Doc. 15, ¶¶ 100-122).

Dudley also asserts Carlton and Dison failed to accommodate Spann's mental health disability and treated him differently because of his disability, thereby denying Spann the benefits and services of the Lauderdale County Detention Center.   (*Id.* ¶¶ 123-171).   She claims Singleton's vicarious liability for Carlton's and Dison's failures under Title of the ADA, the RA, and 42 U.S.C. § 1983, as the Lauderdale County Sheriff's Office allegedly failed to train its employees regarding the ADA or RA to prevent inmate suicide or disability discrimination, thereby demonstrating deliberate

indifference to Carlton's and Dison's violations.   (*Id.* ¶¶ 145-48, 167-70).   She claims that the Lauderdale County Sheriff's Office, which Singleton represents, "has instituted a practice, policy, or custom of not accommodating disabled individuals to ensure a safe and appropriate treatment in accordance with their disabilities."   (*Id.* ¶¶ 149, 171).

As relief for all of her claims, Dudley requests compensatory and punitive damages, costs, attorney fees, "[a]ppropriate injunctive relief, if available," and "[s]uch other relief as this Court deems just and proper."   (*Id.* at 24).

## DISCUSSION

### I.   Dudley's Constitutional Claims Against Defendants Carlton and Dison in their Individual Capacities Pursuant to 42 U.S.C. § 1983

Pursuant to 42 U.S.C. § 1983, Dudley asserts that Carlton and Dison, in their individual capacities, violated Span's Due Process and Equal Protection rights.   *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Personal-capacity suits [under § 1983] seek to impose personal liability upon a government official for actions he takes under color of state law.").   Carlton and Dison assert that the doctrine of qualified immunity shields them from Dudley's claims.

Qualified immunity protects government officials performing discretionary functions in their individual capacity from civil suit and liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   *Hill v. Cundiff*, 797 F.3d 948, 978 (11th Cir.

8

2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   The doctrine provides

"'immunity from suit rather than a mere defense to liability.'" *Pearson v. Callahan*, 555

U.S. 223, 237 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

Consequently, the court must "'resolv[e] immunity questions at the earliest possible

stage in litigation." *Pearson*, 555 U.S. at 232 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227

(1991)).[2]

"When a court concludes [an official] was engaged in a discretionary function,

'the burden shifts to the plaintiff to show that the defendant is not entitled to qualified

immunity.'"   *Hill*, 797 F.3d at 978 (citation omitted).   There exists no dispute Carlton

and Dison performed discretionary functions in these circumstances, so Dudley bears

the burden of persuasion on the balance of the qualified immunity inquiry:   whether

Carlton and Dison violated a constitutional right, and whether the right was clearly

established at the time of the alleged violation.   *Id.* (citation omitted).   Courts retain

discretion to adjudicate one prong without addressing the other.   *Pearson*, 555 U.S. at

236.

---

[2] The court therefore rejects Dudley's argument that it should not evaluate Carlton and Dison's entitlement to qualified immunity until she has had the opportunity to conduct discovery.   (*See* Doc. 29, at 7-8).   The court also declines Dudley's invitation to ignore the qualified immunity doctrine altogether based on "[p]rinciples of policy."   (*Id.* at 9).   This court must follow precedent from the Supreme Court and the Eleventh Circuit Court of Appeals, both of which clearly require application of qualified immunity.   *See McGinley v. Houston*, 361 F.3d 1328, 1331 (11th Cir. 2004) ("A circuit court's decision binds the district courts sitting within its jurisdiction while a decision by the Supreme Court binds all circuit and district courts.") (citation omitted).

Determining whether a constitutional right was clearly established may proceed in three guises.   A right may be clearly established by "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Hill*, 797 F.3d at 979 (citation omitted). Under the second, afore-cited method, "every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Id.* (citation omitted).  The "clearly established right must be defined with specificity." *City of Escondido, Cal. v. Emmons*, - U.S. - , 139 S. Ct. 500, 503 (2019).

In further exposition, a right is clearly established if a defendant acted on "fair warning" that his conduct violated the constitutional rights of the plaintiff. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citing *United States v. Lanier*, 520 U.S. 259 (1997)).  As elaborated, "fair warning" may emanate either from factually similar case law or where the right is one of 'obvious clarity' – i.e., where the officer's conduct "lies so obviously at the very core of what the [constitutional provision] prohibits that the unlawfulness of the conduct was readily apparent to [the official], notwithstanding the lack of fact-specific case law" on point. *Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009)).

In determining whether a right was clearly established, the court refers to binding decisions of the United States Supreme Court, the Eleventh Circuit, and the highest court of the pertinent state. *McClish v. Nugent*, 483 F.3d 1231, 1237 (11ᵗʰ Cir. 2007) (citing *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1032 n.10 (11ᵗʰ Cir. 2001) (en banc), *abrogated on other grounds by Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 561-63 (2007)).

Applying the foregoing concepts demonstrates that Carlton and Dison are entitled to qualified immunity from Dudley's Due Process claim related to Spann's suicide, but not from her Due Process claim related to the alleged denial of medical care. Furthermore, the court will dismiss Dudley's Equal Protection claim based upon "class of one" and traditional theories.

### A.   Qualified Immunity Protects Carlton and Dison from Dudley's Due Process Claim Regarding Spann's Suicide, but Not Her Due Process Claim Regarding the Alleged Denial of Mental Health Treatment Before the Suicide

The parties dispute whether Dudley's Due Process claim encompasses only Spann's suicide, or whether she also asserts a Due Process claim for Defendants' alleged failure to provide adequate mental health care leading up to the suicide. After reviewing Dudley's Amended Complaint, the court concludes it encompasses both claims.

### 1.   Qualified immunity protects Carlton and Dison from Dudley's Fourteenth Amendment Due Process claim regarding Spann's suicide because clearly established law

11

**dictates that neither Defendant possessed subjective knowledge of a strong likelihood Spann would harm himself**

With regard to Spann's suicide, Dudley alleges that Defendants knew or should have known the risk factors for suicide among detainees but failed to identify those factors in Spann and failed to conduct adequate safety checks.   (Doc. 15, ¶¶ 66-70, 77-80).   She alleges that Spann verbalized suicidal thoughts and requested help, which Defendants denied.   (*Id.* ¶¶ 72-74, 81).   She contends that Defendants' failure and denial led to Spann's suicide by hanging.   (*Id.* ¶¶ 75, 94, 98).

"The Due Process Clause of the Fourteenth Amendment guarantees pretrial detainees the right to basic necessities that the Eighth Amendment guarantees convicted persons." *Gish v. Thomas*, 516 F.3d 952, 954 (11th Cir. 2008) (citing *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.,* 402 F.3d 1092, 1115 (11th Cir. 2005) (in turn quoting *Belcher v. City of Foley, Ala.,* 30 F.3d 1390, 1396 (11th Cir. 1994))).   Thus, pretrial detainees, like Spann, "plainly have a Fourteenth Amendment due process right to receive medical treatment for illness and injuries, which encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide." *Jackson v. West*, 787 F.3d 1345, 1352 (11th Cir. 2015) (citing *Cook,* 402 F.3d at 1115).

To proceed on a Due Process claim for Spann's suicide in the face of Carlton and Dison's qualified immunity defense, Dudley must demonstrate relevant law clearly

established that Carlton and Dison displayed deliberate indifference to Spann's taking of his own life. *Jackson*, 787 F.3d at 1353 (citing *Edwards v. Gilbert,* 867 F.2d 1271, 1274-75 (11ᵗʰ Cir. 1989)).  To establish deliberate indifference, Dudley must show Carlton and Dison "'had (1) subjective knowledge of a risk of serious harm; [and] (2) disregard[ed] . . . that risk; (3) by conduct that is more than mere negligence.'" *Snow ex rel. Snow v. City of Citronelle, AL*, 420 F.3d 1262, 1268-69 (11ᵗʰ Cir. 2005) (alterations in original) (quoting *Cook*, 402 F.3d at 1115).

> [I]n a prison suicide case, deliberate indifference requires that the defendant deliberately disregard "a *strong likelihood* rather than a mere possibility that the self-infliction of harm will occur." [*Cagle v. Sutherland*, 334 F.3d 980, 985 (11ᵗʰ Cir. 2003)] (emphasis in original) (quoting *Popham v. City of Talladega,* 908 F.2d 1561, 1563 (11ᵗʰ Cir. 1990)).  "[T]he mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with the care of prisoners." *Id.* (quoting [*Tittle v. Jefferson Cty. Comm'n*, 10 F.3d 1535, 1540 (11ᵗʰ Cir. 1994)].

*Cook*, 402 F.3d at 1115 (third alteration in original, emphasis in original).  "'Absent knowledge of a detainee's suicidal tendencies, . . . failure to prevent suicide has never been held to constitute deliberate indifference.'" *Jackson*, 787 F.3d at 1353 (quoting *Popham,* 908 F.2d at 1564) (ellipsis in original).  Thus, the court must assess the claims against each individual Defendant "'separately and on the basis of what that person knows.'" *Jackson*, 787 F.3d at 1353 (quoting *Burnette v. Taylor,* 533 F.3d 1325, 1331 (11ᵗʰ Cir. 2008)).

No case law from the United States Supreme Court, Eleventh Circuit, or Alabama Supreme Court provided either Carlton or Dison fair warning that their actions and inactions on the date of Spann's suicide would violate Spann's Due Process rights.   Based upon the allegations of Dudley's Amended Complaint, neither Defendant possessed subjective knowledge of a strong likelihood that Spann would harm himself.  If Carlton and Dison read Spann's intake form, they knew he had a history of untreated bipolar disorder, violent opposition to authority, and aggression. The intake form did not report any past suicide attempts or suicidal tendencies.  If Carlton and Dison read the incident log from the previous shift, they knew other inmates assaulted Spann shortly after his arrival.  They had no reason to believe the assault caused Spann to experience suicidal thoughts.

Carlton and Dison both heard Spann state he "did not feel right" and ask to leave his cell, but Spann did not describe the nature of his feeling or state that he might consider suicide.  Importantly, while the Amended Complaint states Spann told his cellmate he would kill himself before returning to prison, it does not allege that the cellmate reported that information to Carlton, Dison, or any other corrections officer.

Those facts do not rise to the level of deliberate indifference to Spann's suicide risk.  While Carlton and Dison may have had notice of Spann's violent and/or antisocial behavior, or even, as discussed more fully below, knowledge that he experienced a mental health ailment, they had no reason to believe that he likely would

14

commit suicide.   The Eleventh Circuit has held that displays of erratic behavior or signs of mental illness, without specific indicia of suicidal tendency, do not provide the level of notice required to trigger the deliberate indifference standard.

In *Jackson,* the Court found that corrections officers did not subjectively appreciate a strong likelihood of suicide as a result of either the inmate's anti-social and aggressive behavior, or his verbal suicide threats months before his actual suicide, when medical staff had addressed those threats and cleared the inmate to return to the general population.   *See Jackson,* 787 F.3d at 1354-56.   As the Eleventh Circuit stated, "'[a]nti-social, aggressive behavioral problems' do not rise to the level of a strong risk of suicide." *Id.* at 1354.   In *Cook,* the Court found that the Sheriff, who managed the jail, had no reason to believe the inmate presented a suicide risk when he had not "previously attempted suicide or . . . ever been considered a suicide risk," even though, the day before he committed suicide, the inmate appeared nervous, experienced chest pains and difficulty breathing, and requested to see a psychiatrist.   *Cook,* 402 F.3d at 1116.

In another decision, an officer's knowledge of an inmate's past suicide attempt, without any indication that the inmate harbored suicidal tendencies around the time of his death, did not depict deliberate indifference to the inmate's needs.   In *Snow,* the Court found that jailers who either did not know of any of the inmate's past suicide attempts, or who knew of only one past attempt at an unspecified time, did not display

15

deliberate indifference by failing to take suicide precautions, even though the inmate displayed erratic and disruptive behavior. *Snow,* 420 F.3d at 1265-69.  In contrast, a jailer who heard of an inmate's suicide attempt in the month prior to his demise, and acknowledged the inmate's suicidal tendency to her family, reflected a triable issue as to deliberate indifference.  *Id.* at 1270.

In the circumstances at bar, Spann displayed aggressive behavior and signs of mental illness.  However, as far as Carlton and Dison knew, he never mentioned suicide or attempted to harm himself.  Thus, no clearly established law gave them notice that the circumstances they faced incited a deliberate indifference issue. *See Cook*, 402 F.3d at 1116 ("No matter how defendants' actions might be viewed, the law of this circuit makes clear that they cannot be liable under § 1983 for the suicide of a prisoner who never had threatened or attempted suicide and who had never been considered a suicide risk.") (citations and internal alteration omitted).

Carlton and Dison also did not receive notice of a strong likelihood of Spann's suicidal tendencies from outside sources.   Dudley's Amended Complaint mentions the results of studies from the United States Department of Justice and Human Rights Watch depicting that young male detainees with histories of mental illness and/or substance abuse suffer the highest suicide risk, and the risk peaks during the first 14 days of confinement.   (Doc. 15, ¶¶ 66-68).   She alleges those studies conferred on the Lauderdale County Jail "institutional knowledge" of the demographics of suicide risk,

16

yet the Jail failed to adequately train its employees to address the risk, resulting in Spann's death.   (*Id.* ¶ 69).

However, the Eleventh Circuit has rejected the argument that this sort of "institutional knowledge" can lead to a finding of deliberate indifference as to a particular inmate's suicide.   In *Edwards v. Gilbert*, 867 F.2d 1271 (11th Cir. 1989), a juvenile inmate "who had never threatened or attempted suicide and who had never been considered a suicide risk" committed suicide in his cell.   *Id.* at 1272, 1277.   His estate argued, despite the lack of any specific suicide threat, that the jail should have taken special suicide precautions based upon expert testimony and an article listing "generalized 'predisposing factors' which the expert contends should have alerted" officers of a risk regarding the inmate.   *Id.* at 1275.   The Eleventh Circuit rejected that argument, stating:

> Plaintiff presented no evidence that either defendant saw the article or was aware of its existence; the testimony was to the contrary.   Plaintiff does not show why defendants had a duty to read the article.   That article, or a similar article, was not, [the sheriff] testified, mentioned in any of the regular training programs for sheriffs that he was required to attend.   The law does not require jail officials to keep up with the latest literature in the social sciences.   The article or opinions of plaintiff's expert cannot be considered part of the information available to the defendants when they acted as they did.

*Id.* at 1276.   Similarly, in the present case, Dudley has not alleged that either Carlton or Dison read or had a duty to read the articles she references, or that they otherwise possessed the knowledge the articles expounded.   Generalized literature cannot confer

on Carlton and Dison knowledge of a strong likelihood that Spann would commit suicide.

As Dudley has not pled a plausible claim Carlton and Dison subjectively possessed actual knowledge of a strong likelihood that Spann would harm himself, qualified immunity prevents her from proceeding with her Fourteenth Amendment Due Process claim regarding a deliberate indifference to Spann's risk of suicide.

> **2.     Dudley plausibly alleges a violation of Spann's clearly established Due Process right to be free from deliberate indifference to his serious medical needs**

Dudley also asserts allegations regarding a denial of mental health treatment before the suicide.   Specifically, she asserts that Defendants "refused to address Spann's needs," "fail[ed] to provide Spann help for his deteriorating mental health," caused Spann "additional mental anguish and pain," and inflicted "substantial harm, including, but not limited to, mental and emotional distress . . . ."   (*Id.* ¶¶ 94, 96, 98).

The Fourteenth Amendment's Due Process clause governs claims by a pretrial detainee, like Spann, who alleges inadequate medical care.   *Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Fla.,* 871 F.3d 1272, 1279 (11th Cir. 2017) (citing *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306 (11th Cir. 2009); *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007)).[3]   To state such a claim, Dudley must allege:   (1) a serious

---

[3] As discussed, "[t]he Due Process Clause of the Fourteenth Amendment guarantees pretrial detainees the right to basic necessities that the Eighth Amendment guarantees convicted persons." *Gish v. Thomas*, 516 F.3d 952, 954 (11th Cir. 2008) (citing *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County,*

medical need; (2) Defendants' deliberate indifference to that need; and (3) a casual connection between Defendants' indifference and Spann's injury. *Nam Dang*, 871 F.3d at 1279 (citing *Goebert*, 510 F.3d at 326). To overcome Carlton and Dison's assertion of qualified immunity, the allegations of Dudley's Amended Complaint must plausibly aver those officers' actions violated clearly established law.

As an initial matter, this claim differs from the claim examined in the prior section regarding an alleged, deliberate indifference to a strong likelihood of a suicide risk, although both claims involve an "official's [alleged] 'deliberate indifference' to a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (citations omitted). As the Eleventh Circuit has discerned:

> Under the Eighth Amendment, prisoners have a right to receive medical treatment for illness and injuries, *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976), which encompasses a right to psychiatric and mental health care, *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986), and a right to be protected from self-inflicted injuries, including suicide, *Edwards*, 867 F.2d at 1274-75. Prison guards who display deliberate indifference to the serious medical and psychiatric needs of a prisoner, or deliberate indifference to a "strong likelihood" that a prisoner will take his own life, violate the Eighth Amendment and may be liable under section 1983. *Estelle*, 429 U.S. at 104-05; *Edwards*, 867 F.2d at 1274-75; *Rogers*, 792 F.2d at 1058.

---

*Fla.,* 402 F.3d 1092, 1115 (11th Cir. 2005) (in turn quoting *Belcher v. City of Foley, Ala.,* 30 F.3d 1390, 1396 (11th Cir. 1994))). The same standards apply to claims asserting the denial of adequate medical care under both the Eighth and Fourteenth Amendments. *See Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Fla.,* 871 F.3d 1272, 1279 (11th Cir. 2017) (citing *Goebert v. Lee Cty.,* 510 F.3d 1312, 1326 (11th Cir. 2007)).

*Belcher*, 30 F.3d at 1396.  As the Court declared in another decision, "[a]cting with deliberate indifference to a serious medical need is a separate claim from acting with deliberate indifference to a known risk of suicide." *Jackson*, 787 F.3d at 1358.

Conceptually, the claim proscribing a deliberate indifference to a known suicide risk encapsulates the subjective awareness and disregard of the risk of violence to an incarcerated individual, with the understanding the risk arises from self-infliction. *See Edwards*, 867 F.2d at 1276 ("The deliberate indifference standard [regarding an individual's suicide] is met only if there were a 'strong likelihood, rather than a mere possibility,' that self-infliction of harm would result.") (citing, *inter alia*, *State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1146 (7th Cir. 1983) (extrapolating from the failure-to-protect an inmate from violence that the "'deliberate indifference' standard [for a § 1983 prison suicide case] is met only if there were a strong likelihood, rather than a mere possibility, that violence would occur")).  Comparatively, a deliberate indifference to psychiatric and mental health needs constitutes a "serious-medical-need claim[] hav[ing] to do with the 'length of delay in providing medical attention depending on the nature of the medical need and the reason for the delay.'" *Jackson*, 787 F.3d at 1358 (quoting *Harris v. Coweta Cnty.*, 21 F.3d 388, 393-94 (11th Cir.1994)).

Accordingly, the court will assess the Due Process claim stemming from the alleged, inadequate responses to Spann's mental health and psychiatric needs.  Based upon the following analysis, Dudley's Amended Complaint lodges a plausible claim that

20

Carlton and Dison's actions and inactions violated Spann's Due Process right to be free

from deliberate indifference to his serious medical needs.

> ### a.   Clearly established law demonstrates Spann displayed a serious medical need

Dudley must first allege, according to clearly established law, that Spann

experienced a serious medical need.

> A serious medical need is "one that has been diagnosed by a
> physician as mandating treatment or one that is so obvious that even a lay
> person would easily recognize the necessity for a doctor's
> attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11ᵗʰ Cir. 2003)
> (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11ᵗʰ Cir.
> 1994)).   In either case, "the medical need must be one that, if left
> unattended, poses a substantial risk of serious harm." *Id.* (citations,
> internal quotations marks, and alteration omitted).

*Nam Dang*, 871 F.3d at 1280.

Spann's bipolar disorder, which Dudley alleges a physician diagnosed,

constituted a serious medical need that posed a risk of serious harm if unattended.

(Doc. 15, at 1 ("As a young man, Brandon Spann was diagnosed with Bi-Polar disorder,

a condition that caused him to act erratically.")).   In addition, Spann's intake indicated

he suffered a history of severe mental illness, and he did not receive any treatment for

his illnesses.   These averments reflect Spann manifested a serious medical need. *See*

*Thomas v. Bryant*, 614 F.3d 1288, 1312 (11ᵗʰ Cir. 2010) (quoting *Gates v. Cook*, 376 F.3d

323, 332 (5ᵗʰ Cir. 2004)) ("The case law establishes that 'mental health needs are no less

serious than physical needs' for purposes of the Eighth Amendment."); *Steele v. Shah*,

87 F.3d 1266, 1269 (11th Cir. 1996), *as amended* (Sept. 6, 1996) (citing *Greason, supra* ) (In the Eleventh Circuit, "it is established that psychiatric needs can constitute serious medical needs . . . .")); *Greason v. Kemp,* 891 F.2d 829, 834 (11th Cir. 1990) ("[D]eliberate indifference to an inmate's need for mental health care is actionable on eighth amendment grounds . . . ."); *Rogers*, 792 F.2d at 1058 ("Failure to provide basic psychiatric and mental health care states a claim of deliberate indifference to the serious medical needs of prisoners."). .

      **b.    Clearly established law demonstrates Carlton and Dison displayed deliberate indifference to Spann's serious medical needs**

To rehash, the deliberate indifference standard requires Dudley to plausibly allege: (1) Carlton and Dison subjectively knew of the risk of serious harm to Spann, yet they (2) disregarded that risk (3) "by conduct that is more than mere negligence." *Nam Dang*, 871 F.3d at 1280 (citing *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)).

To possess subjective knowledge of a risk of serious harm, Carlton and Dison must "be 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference.'" *Id.* (quoting *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099-1100 (11th Cir. 2014)). "'[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference.'"  *Id.* (alteration in original) (citing *Burnette,* 533 F.3d at 1331).  Rather,

the court must judge each individual defendant "separately and on the basis of what that person kn[ew]."  *Id.* (citing *Burnette*, 533 F.3d at 1331).  An official's disregard of a serious risk rises above the level of mere negligence "'when he [or she] knows that an inmate is in serious need of medical care, but he [or she] fails or refuses to obtain medical treatment for the inmate.'"  *Id.* (alterations in original) (quoting *Lancaster v. Monroe Cty., Ala.*, 116 F.3d 1419, 1425 (11ᵗʰ Cir. 1997), *overruled on other grounds by LeFrere v. Quezada*, 588 F.3d 1317, 1318 (11ᵗʰ Cir. 2009)).

Accepting the allegations of Dudley's Amended Complaint as true, clearly established law sustains a plausible claim that Carlton and Dison possessed subjective knowledge of Spann's serious medical need, specifically his need for psychiatric and mental health care.  Critically, drawing all reasonable inferences in Dudley's favor illustrates Carlton and Dison reviewed the Detention Center's incident log. (*See* Doc. 15, ¶¶ 26-27 ("The Detention Center maintains a log that details *all* the incidents that occur on each shift. The log serves as a record for the *corrections officers and other staff to share important information about the inmates* they are charged with guarding.") (emphasis added)).

Pursuant to the Amended Complaint's averments, the Detention Center's incident log recorded the following facts reasonably inferable to Carlton and Dison's awareness:   on May 1, 2018, Spann tossed food in the detoxification cell while shirtless, which resulted in officers restraining him in a psychiatric chair; he suffered an untreated

bi-polar disorder and a history of severe mental illness; he violently opposed authority and exhibited aggression with law enforcement; other detainees assaulted him; and the nurse ordered his housing in a cell with a camera. *See Popham*, 908 F.2d at 1564 ("Closed circuit cell monitoring is . . . reflective of a custodial concern for [a detainee's] welfare.") (citation omitted).

Three days after the events and profile recorded in the incident report – and without any evidence Spann obtained any further care for his mental health and psychiatric needs – Spann kicked his cell door and informed Carlton and Dison respectively that he did "not feel right" and needed to leave his cell.   Dudley's allegations demonstrate that Spann's mental condition deteriorated during confinement.   Spann's door-kicking and declaration that he did not feel right and needed to leave his cell – coupled with knowledge from an incident log that Spann suffered an untreated bipolar disorder; depicted a history of severe mental illness; violently opposed authority and exhibited aggression with law enforcement; tossed food in the detoxification cell while shirtless, resulting in restraint in a psychiatric chair; and incurred an assault from other detainees – sufficiently presents a plausible claim that Defendants possessed subjective awareness of Spann's risk of serious mental health needs and inferred such needs from the circumstances.   Indeed, that Carlton and Dison refused to allow Spann to leave his cell – and informed him he would not leave

24

the cell on their watch – incites the reasonable inference that Spann's behavior and orientation spurred the officers to preclude his release.

Furthermore, the Amended Complaint avers that Daniel Odom, another detainee, checked on Spann because he overhead Spann's pleas that he felt unwell, thus leading to the discovery Spann hanged himself.  This averment depicts that another person at the Detention Center heard Spann's pleas and formed the belief that Spann's mental condition warranted attention.  Those circumstances further support the plausible claim that Carlton and Dison possessed knowledge of Spann's serious medical need.  *See Patel v. Lanier Cty. Georgia*, 969 F.3d 1173, 1190-91 (11th Cir. 2020) (A "deliberate-indifference-to-medical-needs claim . . . requires evidence that 'even a lay person would easily recognize the necessity for a doctor's attention.'")) (citation omitted); *Farrow*, 320 F.3d at 1246 (jail physician had subjective knowledge of inmate's serious need for dentures when inmate told the physician he needed a soft diet and experienced pain, weight loss, and bleeding gums); *Waldrop v. Evans*, 871 F.2d 1030, 1036 (11th Cir. 1989) (defendant knew of inmate's need for psychiatric referral given prior referral to a psychiatrist for inmate's nausea, nightmares, and insomnia, and inmate's subsequent self-inflicted laceration).

The allegations of the Amended Complaint also plausibly demonstrate Carlton and Dison disregarded the risk of serious harm to Spann by conduct that exceeded mere negligence.  Clearly established Eleventh Circuit law provides that "[a] defendant who

unreasonably fails to respond or refuses to treat an inmate's need for medical care or one who delays necessary treatment without explanation or for non-medical reasons may also exhibit deliberate indifference." *Melton v. Abston*, 841 F.3d 1207, 1223 (11th Cir. 2016) (citing *Waldrop*, 871 F.2d at 1036; *Farrow*, 320 F.3d at 1247; *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990)).   In addition, a jail official deliberately disregards a known risk of serious harm when he or she fails to investigate an inmate's complaints. *See Goebert*, 510 F.3d at 1328 ("Choosing to deliberately disregard, without any investigation or inquiry, everything any inmate says amounts to willful blindness."). Despite the foregoing evidence plausibly demonstrating Spann's acute psychiatric needs, Carlton and Dison did not seek medical attention for Spann.

Therefore, general principles of applicable case law clearly establish that Carlton and Dison's alleged failure to respond to Spann's complaints demonstrated deliberate indifference to his serious medical needs.   *See Patel*, 969 F.3d at 1190-91 (officer who "was confronted with a serious medical need and did *nothing*" could not avail himself of qualified immunity, even in the absence of "any controlling case with closely analogous facts") (emphasis in original);[4] *Danley v. Allen*, 540 F.3d 1298, 1312, 1313 (11th Cir. 2008) (citing *Bozeman v. Orum*, 422 F.3d 1265, 1273 (11th Cir. 2005)) ("'When prison guards

---

[4] Even though the Eleventh Circuit decided *Patel* after the events that form the basis of this lawsuit, the cases that *Patel* relied upon as explicating more generalized, yet still clearly established, constitutional principles dated before the relevant events. *See Patel v. Lanier Cty. Georgia*, 969 F.3d 1173, 1190-91 (11th Cir. 2020) (citing *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985); *J W ex rel. Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1259 (11th Cir. 2018)).

ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference.' . . . "Our earlier deliberate indifference decisions have stated that when jailers are aware of serious medical needs they may not ignore them or provide grossly inadequate care."), *overruled on other grounds as recognized in Randall v. Scott*, 610 F.3d 701, 709-10 (11th Cir. 2010); *McElligott*, 182 F.3d at 1255 ("Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable.") (citations omitted); *Brown*, 894 F.2d at 1538 ("A prison guard's intentional denial or delay of medical care is evidence of deliberate indifference. . . . When prison guards ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference.") (citations omitted); *Waldrop*, 871 F.2d at 1036 ("[P]rison officials have an obligation to take action or to inform competent authorities once the officials have knowledge of a prisoner's need for medical or psychiatric care.") (citation omitted).[5]

---

[5] The Eleventh Circuit initially found that the holding in *Waldrop v. Evans*, 871 F.3d 1030 (11th Cir. 1989), only addressed the liability of physicians in detention circumstances. *Haney v. City of Cumming*, 69 F.3d 1098, 1102-03 (11th Cir. 1995) (citing *Belcher v. City of Foley*, 30 F.3d 1390, 1395 (11th Cir. 1994)). As established herein, however, the Eleventh Circuit clearly extended the principles of *Waldrop* to all detention officials. *See Melton v. Abston*, 841 F.3d 1207, 1223-33 (11th Cir. 2016).

### c.   Clearly established law demonstrates a causal connection existed between Defendants' indifference and Spann's injury

Finally, clearly established law demonstrates the Amended Complaint averred a plausible casual connection between Defendants' indifference and Spann's injury. Eleventh Circuit law clearly and concisely states that "[c]ausation . . . can be shown by personal participation in the constitutional violation." *Goebert*, 510 F.3d at 1327 (citing *Zatler v. Wainwright,* 802 F.2d 397, 401 (11th Cir. 1986)).   In addition, the Eleventh Circuit ascertained deliberate indifference when medical officials "basically did nothing to alleviate [an inmate's] pain, essentially letting [the inmate] suffer even as his condition was deteriorating."   *McElligott*, 182 F.3d at 1257.

Because the Amended Complaint avers that Carlton and Dison personally displayed deliberate indifference to Spann's serious mental health needs, Dudley has alleged sufficient facts to plausibly demonstrate causation.   Case law gave Carlton and Dison fair notice that the alleged disregard of Spann's serious mental health need may result in Constitutional injury. *See id.* at 1257 ("A core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness.").

In summary, Dudley's Amended Complaint plausibly alleges a deliberate indifference claim under the Fourteenth Amendment Due Process clause pursuant to clearly established law.   The evidence garnered during discovery may not exhibit the facts pleaded in the Amended Complaint, but at this juncture, Dudley can proceed on her Fourteenth Amendment Due Process claim alleging denial of appropriate mental health care prior to Spann's suicide.

### B.   The Court Will Dismiss Dudley's Equal Protection Claim Based Upon "Class of One" and Traditional Theories

Dudley asserts an Equal Protection claim against Carlton and Dison, in their individual capacities, based upon those officers' alleged refusal to allow Spann out of his cell, even though they allowed other inmates without mental health disabilities to leave their cells.   (Doc. 15, ¶¶ 101-22).   The parties' briefs characterize those allegations as presenting a "class of one" Equal Protection claim, which would require Dudley to demonstrate that Carlton and Dison intentionally treated other, similarly situated people differently, and no rational basis existed for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

The Supreme Court differentiates between "typical" Equal Protection claims, in which "governmental classifications . . . 'affect some groups of citizens differently than others,'" and "class of one" claims, in which "the plaintiff has not alleged class-based discrimination, but instead claims that she has been irrationally singled out" for

29

differential treatment.  *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 601 (2008) (citations omitted); *see also Alford v. Consol. Gov't of Columbus, Ga.*, 438 F. App'x 837, 839 (11ᵗʰ Cir. 2011) (citing *Engquist*, 553 U.S. at 595-97; *Lieb v. Hillsborough Cnty. Pub. Transp. Comm'n,* 558 F.3d 1301, 1306 (11ᵗʰ Cir. 2009)) ("In a 'class of one' equal protection claim, . . . a plaintiff does not allege discrimination against a protected class or on account of membership in a particular group, but rather, asserts that he has been treated differently from others similarly situated for arbitrary or irrational reasons.").  Even so, as the Sixth Circuit recognized in *Davis v. Prison Health Servs.*, 679 F.3d 433 (6ᵗʰ Cir. 2012), some courts and parties erroneously conflate the claims based upon misleading language from opinions that

> blend[s] together the "class-of-one" concept and the standard of review for an equal protection claim that does not target a suspect class or burden a fundamental right — *i.e.,* rational basis review — to erroneously suggest that every claim subject to rational basis review is a "class-of-one" claim.

*Id.* at 441 (citing *Club Italia Soccer & Sports Organization, Inc. v. Charter Township of Shelby,* 470 F.3d 286 (6ᵗʰ Cir. 2006)).  District courts should resist the tendency to meld the two concepts.  As the Sixth Circuit instructed, "[a]lthough all 'class-of-one' claims are subject to rational basis review, not all claims subject to rational basis review are 'class-of-one' claims."  *Davis*, 679 F.3d at 441.

As an initial matter, Dudley has not averred a plausible class-of-one Equal Protection claim.  As recounted previously, a class-of-one claim requires intentional

differentiation from other similarly-situated individuals. *Lieb*, 558 F.3d at 1306.   The Amended Complaint does not depict Spann was similarly situated to the other detainees who Defendants allowed out of their cells.   In particular, as the Amended Complaint avers, Defendants Carlton and Dison knew that Spann tossed food in the detoxification cell while shirtless, which resulted in officers restraining him in a psychiatric chair; suffered an untreated bi-polar disorder and a history of severe mental illness; violently opposed authority and exhibited aggression with law enforcement; and other detainees assaulted him.   These averments present a significant dissimilarity vis-à-vis Spann and the detainees Defendants allowed out of their cells.

Likewise, Dudley cannot maintain a "traditional" Equal Protection claim. Dudley asserts that Carlton and Dison treated Spann differently from other inmates because of his mental disability.   "'Proof of discriminatory intent or purpose is a necessary prerequisite to any Equal Protection Clause claim,' . . . and the Supreme Court has said that the idea of intention or purpose means that 'the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.'" *Corey Airport Servs., Inc. v. Clear Channel Outdoor, Inc.*, 682 F.3d 1293, 1297 (11th Cir. 2012) (citations and internal alterations omitted).   Therefore, "to state a claim based on a violation of a clearly established right, [Dudley] must plead sufficient factual matter to show that [Carlton

and Dison acted against Spann] not for a neutral . . . reason but for the purpose of discriminating on account of [disability]." *Iqbal*, 556 U.S. at 677.

As discussed previously, the parties assessed the Equal Protection claim under a class-of-one theory.   Therewith, Dudley has not averred any facts demonstrating that Carlton and Dison harbored a discriminatory animus against Spann on the basis of his mental disability.   Indeed, the only averments demonstrating differential treatment involves the allowance for other detainees to leave their cells, yet Spann was not similarly situated to other detainees in this regard given the events that transpired upon Spann's incarceration and his history of mental disability and aggression.   For these reasons, the court will dismiss the Equal Protection claim, subject to Dudley proceeding at a subsequent juncture – if warranted – with averments appropriately demonstrating a plausible Equal Protection claim.

## II.   Dudley's Amended Complaint Plausibly Alleges a Violation of the Americans With Disabilities Act and the Rehabilitation Act, Yet She Cannot Obtain a Remedy

Dudley asserts Defendant Singleton, in his official capacity as Sheriff of Lauderdale County, Alabama, violated Spann's rights under Title II of the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA).   She claims Singleton is vicariously liable for his deputies' actions and inactions under 42 U.S.C. § 1983 because their alleged statutory violations resulted "from a failure to train, monitor, and discipline officers and employees; their deliberate indifference thereto; and practice, policy, or

procedure that allows such violations to occur."   (Doc. 15, ¶¶ 136, 145-46, 159, 168-69).[6]

Singleton did not challenge Dudley's use of § 1983 as a vehicle for her ADA and RA claims, but the court notes at the outset that the statutory claims cannot proceed under § 1983.   In *Holbrook v. City of Alpharetta, Ga.*, 112 F.3d 1522 (11th Cir. 1997), the Eleventh Circuit held that "a plaintiff may not maintain a section 1983 action in lieu of – or in addition to – a Rehabilitation Act or ADA cause of action if the only alleged deprivation is of the employee's rights created by the Rehabilitation Act and the ADA." *Id.* at 1531 (citing *Johnson v. Ballard,* 644 F. Supp. 333, 337 (N.D. Ga. 1986) (in turn citing *Day v. Wayne County Bd. of Auditors,* 749 F.2d 1199, 1204 (6th Cir. 1984))).

Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."   42 U.S.C. § 12101(b)(1).   Title II of the ADA prohibits a "public entity" from discriminating against "a qualified individual with a disability" because of the individual's disability:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services,

---

[6] Dudley's Amended Complaint contains two counts addressing these claims.   Count Three asserts "Violation of the Americans with Disabilities Act, the Rehabilitation Act," and Count Four asserts "Section 504 of the Rehabilitation Act, 29 U.S.C. § 701 et. seq."   (Doc. 15, at 16, 20).   Count Three contains four non-material factual allegations that Count Four does not contain (*see* Doc. 15, ¶¶ 128-133); otherwise, the two counts are identical.   Thus, the court will consider the two counts together.

programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

The Supreme Court instructs that a disabled detainee may sustain a claim under Title II of the ADA if, because of his disability, officials deny him participation in an activity or service the jail provides.   *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210-11 (1998); *see also Mazzola v. Davis*, 776 F. App'x 607, 610 (11th Cir. 2019) (citing *Yeskey*, 524 U.S. at 210; *Hafer v. Melo*, 502 U.S. 21, 25 (1991)) ("State prisons are public entities for purposes of the ADA, and suits against public officials in their official capacities are considered suits against the entity the official represents.").[7]

---

[7] *Yeskey* addressed claims by a state prison inmate, but the holding extends equally to a pretrial detainee in a county jail.   Title II defines the term "public entity" to include "(A) any State or local government; (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and (C) the National Railroad Passenger Corporation, and any commuter authority . . . ." 42 U.S.C. § 12131(1).   Regulations implementing Title II state they apply to "public entities that are responsible for the operation or management of adult and juvenile justice jails, detention and correctional facilities, and community correctional facilities . . . ." 28 C.F.R. § 35.152(a).   Those regulations require public entities to "ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity." 28 C.F.R. § 35.152(b)(1).   Moreover, in Alabama, county sheriffs serve as executive officers of the State.   *See* Ala. Const. art. V, § 112 ("The executive department shall consist of a . . . sheriff for each county.").   Finally, other district courts have applied Title II in the context of county or municipal jails.   *See Hutchinson v. Cunningham*, No. 2:17-CV-185-WKW-GMB, 2018 WL 1474906, at *24-25 (M.D. Ala. Jan. 23, 2018), *report and recommendation adopted*, No. 2:17-CV-185-WKW, 2018 WL 1474532 (M.D. Ala. Mar. 26, 2018) (applying ADA and RA to claims against a Sheriff and other officials the Sheriff employed); *Burke v. Miami-Dade Cty.*, No. 16-25190-CIV, 2017 WL 4119625, at *10 (S.D. Fla. Sept. 18, 2017) (citing *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir. 2007)) ("Under *Bircoll*, Miami-Dade County is clearly a public entity under the second prong of a Title II claim and the Miami-Dade Police Department is an extension of Miami-Dade County."); *Young v. City of Tampa*, No. 8:15-CV-226-T-35MAP, 2017 WL 5239473, at *15 (M.D. Fla. Mar. 6, 2017), *aff'd*, 713 F. App'x 986 (11th Cir. 2018) (citing *Bircoll*, 480 F.3d at 1081-85)

Section 504 of the Rehabilitation Act (RA) similarly provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."   29 U.S.C. § 794(a).   The same standards govern ADA and RA cases, other than the RA's requirement that the program or activity receive Federal financial assistance.   *J.S., III v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017); *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000).

A plaintiff alleging discrimination under either the RA or Title II of the ADA must show: (1) he is a qualified individual with a disability; (2) a public entity excluded him from participation in or denied him the benefits of the entity's services, programs, or activities, or otherwise discriminated against him; and (3) the public entity excluded the plaintiff, denied the benefit, or otherwise discriminated because of the plaintiff's disability or a failure to accommodate the disability.   *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir. 2007); *Nadler v. Harvey*, No. 06-12692, 2007 WL 2404705, at *5 (11th Cir. Aug. 24, 2007) (citing *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001)).

---

("The Eleventh Circuit has previously held that an arrestee may be able to state a claim under Title II of the ADA against a public entity based upon the conduct of its arresting officers."); *Green v. Roberts*, No. 2:06-CV-667-WKW, 2008 WL 4767471, at *10 (M.D. Ala. Oct. 29, 2008) (citing *Yeskey*, 524 U.S. 206) ("Prisons and jails are public entities covered by the ADA.").

35

Title II defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications . . . or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."   42 U.S.C. § 12131(2).   In further refinement, Department of Justice regulations provide that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."   28 C.F.R. § 35.130(b)(7).   Thus, an ADA claim may proceed on theories of intentional discrimination, disparate treatment, or failure to make reasonable accommodations. *See Rylee v. Chapman*, 316 F. App'x 901, 906 (11th Cir. 2009) (citing *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008)).

For purposes of the motion to dismiss, Singleton has not challenged the following:   (1) that Spann, who suffered from bipolar disorder, constituted a qualified individual with a disability;[8] (2) that, in his official capacity as Sheriff of Lauderdale County, he represents a public entity; (3) that the entity receives federal funding; or (4)

---

[8] *See* Doc. 15, ¶¶ 125, 152 ("Brandon Spann was a person with a disability, as defined by 42 U.S.C. § 12102, and 29 U.S.C. § 705, because Bi-Polar Disorder substantially limited several of his major life activities, including thinking, sleeping [and] interacting with others.").

that the actions and/or inactions of the Detention Center's corrections officers can lead to his own vicarious liability.[9]

However, Singleton argues that he did not exclude Spann from participation in, or deny him the benefits of, the Detention Center's services, programs, or activities, and that he did not otherwise discriminate against Spann because of his disability.   The court disagrees, and finds that the allegations of Dudley's Amended Complaint establish ADA and RA violations under a failure to accommodate theory, but not a differential treatment theory. Nonetheless, Dudley's claim falters because she cannot obtain monetary or injunctive relief on her claim.

### A.   Dudley's Amended Complaint Adequately Alleges that Singleton Failed to Accommodate Spann's Disability Pursuant to the ADA and RA, But Her Claim Garners No Relief by Itself

A failure to accommodate constitutes a distinct claim from a disparate treatment or intentional discrimination claim, as "a failure to make reasonable accommodation claim requires no animus" or "discriminatory motivation." *Nadler*, 2007 WL 2404705, at *4, 8. Dudley's Amended Complaint alleges that Singleton's agents failed to make reasonable accommodations under the ADA and RA because they denied Spann care for his mental health needs.   (Doc. 15, ¶¶ 129-32, 155-56).   Dudley asserts that

---

[9] This, of course, does not prevent Singleton from raising these issues at a later stage.   For the parties' future reference, the court notes the Eleventh Circuit recently stated that "the availability of respondeat superior for Title II and the § 504 claims remains an open question." *Silberman*, 927 F.3d at 1134 n.6 (citing *T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cty., Fla.*, 610 F.3d 588, 604 (11th Cir. 2010)).

"[p]otential accommodations might have included, but are not limited to, seeking medical attention from the nurse on duty and placing [Spann] in the camera monitored cell as the nurse requested until a proper mental health evaluation could be conducted."

(*Id.* ¶¶ 132, 156).   She further alleges:

> 140.   Failing to provide Spann the help he needed, or in [the] alternative, to place him in a safe environment in which he could not hurt himself denied him the services and benefits offered to those who are arrested and held in the custody of the Defendant.
>
> 141.   [Spann] could have been detained safely and appropriately consistent with his disability, and failing to do so placed him at risk, caused him injury, and subjected him to discrimination on the grounds of his disability.
>
> 142.   The Defendants placed Spann in a situation made dangerous because of his disability as he was ignored after seeking help for his disability and not held in a monitored cell as ordered by the Detention Center's Medical staff.
>
> 143.   Because of these actions, Brandon suffered from severe mental and emotional distress that culminated in his death.

(*Id.* ¶¶ 140-43; *see also id.* ¶¶ 163-66).   She also asserts the Lauderdale County Sheriff's Office has not implemented policies or conducted employee training regarding ADA and RA compliance or suicide prevention, thereby displaying deliberate indifference to statutory violations and "instituting a practice, policy, or custom of not accommodating disabled individuals to ensure a safe and appropriate treatment in accordance with their disabilities."   (*Id.* ¶¶ 147-49, 170-71).

Singleton argues that Dudley's failure to accommodate claim must fail because it merely asserts a denial of mental health care.   However, applicable authority distinguishes a failure to treat a disability, which does not violate the ADA or RA, from a refusal to reasonably modify or accommodate a disability, which constitutes disability discrimination.

On one side of the spectrum, the Eleventh Circuit ruled in *Schiavo v. Schiavo*, 403 F.3d 1289, 1294 (11th Cir. 2005), that the ADA does not encompass decisions regarding appropriate medical treatment for a person with a disability.   Likewise, in *Jones v. Rutherford*, 546 F. App'x 808 (11th Cir. 2013), the plaintiff suffered injury from severe drug and alcohol withdrawal while he was a pretrial detainee.   The Eleventh Circuit upheld summary judgment in the defendants' favor on the plaintiff's ADA claim.   The plaintiff argued merely that he received insufficient medical care, and the Court responded the ADA is not a "'remedy for medical malpractice'" and "'would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners.'"   *Id.* at 811-12 (quoting *Schiavo*).

The decision in *Lonergan v. Fla. Dep't of Corr.*, 623 F. App'x 990 (11th Cir. 2015), reflects the other side of the spectrum.   The plaintiff alleged prison officials refused to honor his physician's order that he avoid sunlight to treat actinic keratosis, a type of pre-cancer.   The Eleventh Circuit determined the plaintiff successfully alleged more than mere disagreement with his medical treatment.   Rather, he sought the treatment

his dermatologist recommended.   While the fact-finder may ultimately determine other measures provided by prison officials sufficiently accommodate his condition, "the failure of the prison to give the Plaintiff the treatment prescribed by his dermatologist is sufficient for the Plaintiff to plead a prima facie ADA claim."   *Id.* at 994.

As another portrayal, in *Estate of Smith v. Forest Manor, Inc.*, No. 7:16-CV-01774-RDP, 2018 WL 2770203, at *6 (N.D. Ala. June 8, 2018), the court examined the defendant's alleged failure to reasonably accommodate a patient's request for modification of wheelchair transportation.   The court distinguished *Schiavo* and similar cases because they involved "purely medical decisions" which did not implicate the ADA or RA, while the case before it implicated decisions by non-medical personnel as to the appropriate wheelchair transportation for the patient.   *Id.* at *6; *see also Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 284, 287 (1st Cir. 2006) (defendants' alleged denial of plaintiff's access to his prescription medications, a shower chair or accessible shower facilities, front cuffing, and lower tier and bottom bunk placements, do not reflect medical judgments subject to differing opinion but "outright denial of medical services" potentially violating Title II); *Frasca v. Fla. Dep't of Corr.*, No. 3:16-CV-1468-J-32MCR, 2018 WL 3642275, at *4 (M.D. Fla. Aug. 1, 2018) (plaintiff alleged a prima facie ADA claim when he sought the treatment that medical personnel prescribed, a low bunk assignment, but prison officials assigned him a high bunk); *Johnson v. Bryson*, No. 5:16-CV-453-CAR-MSH, 2017 WL 3951602, at *1-2 (M.D. Ga. Sept. 8, 2017) (defendants'

40

alleged failure to treat plaintiff's hepatitis ailment due to cost states a plausible ADA claim rather than a mere disagreement with medical treatment); *Mitchell v. Williams*, No. 6:15-cv-93, 2016 WL 723038, at *4 (S.D. Ga. Feb. 22, 2016) (defendants' alleged failure to treat plaintiff's hepatitis ailment due to cost states a plausible ADA claim rather than a mere disagreement with medical treatment).

Based upon the foregoing delineation in the caselaw, the court concludes Dudley has not merely asserted her disagreement with the mental health care Spann received at the Lauderdale County Detention Center.   She contends that officials failed to implement, or at least to adequately continue, the jail nurse's recommendation to place Spann in a cell under close observation, and that Carlton and Dison's refusal to grant Spann's requests to leave his cell constituted a failure to accommodate Spann's mental health needs.   Pursuant to the afore-described caselaw, those alleged deprivations plausibly constituted denial of medical services the Center provided to its detainees. *See Popham*, 908 F.2d at 1564 ("Closed circuit cell monitoring is . . . reflective of a custodial concern for [a detainee's] welfare.") (citation omitted).   They also prevented Spann from availing himself of the Detention Center's policy of "allowing inmates to leave their cells for various purposes throughout the day."   (Doc. 15, ¶ 42).   *See Yeskey*, 524 U.S. at 210 ("Modern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least

theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in').").

Singleton also argues Spann did not request a mental health accommodation with sufficient specificity to trigger the ADA or RA.[10]  "In cases alleging a failure to make reasonable accommodations, the defendant's duty to provide a reasonable accommodation is not triggered until the plaintiff makes a 'specific demand' for an accommodation." *Rylee*, 316 F. App'x at 906 (citing *Gaston v. Bellingrath Gardens & Home, Inc.,* 167 F.3d 1361, 1363 (11th Cir. 1999)).

> Although the Eleventh Circuit has not ruled on the specificity required of a request for accommodation under Title II of the ADA, that court has held in Fair Housing Act and ADA Title I cases that no particular form is required.  Rather, the focus is whether the defendant "[has] enough information to know of both the disability and desire for an accommodation, or circumstances must at least be sufficient to cause a reasonable [defendant] to make appropriate inquiries about the possible need for accommodation." *United States v. Hialeah Hous. Auth.*, 418 Fed. Appx. 872, 876 (11th Cir. 2011) (quoting *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 506 (3d Cir. 2010)); *see also Holly v. Clarison Indus., LLC*, 492 F.3d 1247, 1261 n.14 (11th Cir. 2007) (noting in ADA Title I case that the Eleventh Circuit has not "determined precisely what form the request must take").

*Alvey v. Gualtieri*, No. 8:15-CV-1861-T-33AEP, 2016 WL 6582897, at *10 (M.D. Fla. Nov. 7, 2016).  Therefore, "for a demand to be specific enough to trigger the duty to provide a reasonable accommodation, the defendant must have enough information to

---

[10] The court notes this argument, even if successful, would only defeat a failure to accommodate claim based on Spann's verbal requests to leave his cell.  The argument would not address the officials' alleged failure to implement the jail nurse's recommendation to place Spann in a heavily monitored cell.

know of both the disability and a desire for an accommodation, or circumstances must at least be sufficient to cause a reasonable [defendant] to make appropriate inquiries about the possible need for an accommodation." *Hialeah Housing Authority*, 418 F. App'x at 876.[11]

Here, Dudley avers Lauderdale County Detention Center officials knew of Spann's bipolar disorder and history of several mental illness because he identified it during intake.   Likewise, the jail nurse ordered Singleton's agents to place Spann in a cell with a camera.   Moreover, Spann directly asked Carlton and Dison to take specific action – removing him from his cell – to accommodate his mental distress.   Those verbal requests – along with the other referenced averments – plausibly allege that jail

---

[11] *See also Musgrove v. Vilsack*, 173 F. Supp. 3d 1337, 1347 (M.D. Ga. 2016) (same) (citing *Salser v. Clarke County School District*, 802 F. Supp. 2d 1339, 1356 (M.D. Ga.2011) (same)); *Ely v. Mobile Hous. Bd.*, 13 F. Supp. 3d 1216, 1231-32 (S.D. Ala. 2014) (same), *aff'd*, 605 F. App'x 846 (11th Cir. 2015); *Collins v. Compass Grp., Inc.*, 965 F. Supp. 2d 1321, 1347 (N.D. Ala. 2013) (same); *Schandolph v. Bd. of Regents of Univ. Sys. of Georgia*, No. CV417-247, 2019 WL 6041071, at *8 (S.D. Ga. Nov. 13, 2019) (same); *Wiggins v. City of Montgomery*, No. 2:17CV425-SMD, 2019 WL 4593487, at *9 n. 5 (M.D. Ala. Sept. 20, 2019) (same); *Nazarova v. Hillcrest E. No. 22, Inc.*, No. 18-60387-CIV, 2018 WL 3544339, at *4 (S.D. Fla. July 3, 2018) (same), *report and recommendation adopted*, No. 18-60387-CIV, 2018 WL 3536310 (S.D. Fla. July 23, 2018); *Hambright v. Bartow Cty., Georgia*, No. 4:16-CV-236-HLM-WEJ, 2017 WL 6460246, at *17 (N.D. Ga. July 11, 2017) (same); *Hollingsworth v. O'Reilly Auto. Stores, Inc.*, No. 4:13-CV-01623-KOB, 2015 WL 412894, at *11 (N.D. Ala. Jan. 30, 2015) (same); *Sackman v. Balfour Beatty Communities, LLC*, No. CV 113-066, 2014 WL 4415938, at *6 (S.D. Ga. Sept. 8, 2014) (same); *Flowers v. City of Tuscaloosa*, No. 7:11-CV-01375-JEO, 2013 WL 625324, at *13 (N.D. Ala. Feb. 14, 2013) (same); *10th St. Partners, LLC v. Cty. Comm'n ex rel. Sarasota Cty., Fla.*, No. 8:11-CV-2362-T-33TGW, 2012 WL 4328655, at *5 (M.D. Fla. Sept. 20, 2012) (same); *Distler v. El-Ad Reserve at Lake Pointe, L.L.C.*, No. 8:10-CV-1018-T-33TGW, 2011 WL 3715091, at *4 (M.D. Fla. Aug. 24, 2011) (same).

officials should have lodged appropriate inquiries about the need for an accommodation for Spann's disability.[12]

In summary, the court concludes Dudley adequately asserted that Spann requested an accommodation for his mental health disability, that jail officials both refused that accommodation and refused to implement the mental health care recommendations of the jail nurse, and that those refusals excluded Spann from participation in or denied him the benefits of the Lauderdale County Detention Center's services, programs or activities.

However, Dudley's failure-to-accommodate claim, by itself, affords her no relief:

> In the ordinary course, proof of a Title II or § 504 violation entitles a plaintiff only to injunctive relief. *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 831 (11th Cir. 2017). To get damages[,] a plaintiff must clear an additional hurdle: he must prove that the entity that he has sued engaged in intentional discrimination, which requires a showing of "deliberate indifference." *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 348 (11th Cir. 2012).

*Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1134 (11th Cir. 2019).

---

[12] The cases Dudley cites do not persuade the court otherwise because they did not involve the failure to follow a health professional's specific directive and addressed less direct accommodation issues than those Spann presented. *See Hudson v. Tyson Farms, Inc.*, 769 F. App'x 911, 918-19 (11th Cir. 2019) (employee did not make a specific accommodation request when she asked her line leader if she could take a break to use her inhaler); *McCarroll v. Somerby of Mobile*, LLC, 595 F. App'x 897, 899 (11th Cir. 2014) (employee did not make a specific accommodation request when he told his supervisor he was "too sore to work"); *Salem v. City of Port St. Lucie*, No. 2:17-CV-14431-ROSENBERG/MAYNARD, 2018 WL 5631305, at *5 (S.D. Fla. Oct. 31, 2018), *aff'd* 788 F. App'x 692 (11th Cir. 2019) (employee did not make a specific accommodation request when he merely asked why he couldn't undergo testing after he was released from light duty); *Alvarez v. Sch. Bd. of Broward Cty.*, 208 F. Supp. 3d 1281, 1287 (S.D. Fla. 2016) (employee did not make a specific accommodation request when he merely told his supervisor he suffered from a particular disability).

In this case, Dudley cannot obtain injunctive relief due to a lack of Article III standing:

> To satisfy the injury-in-fact requirement for constitutional standing, a plaintiff seeking injunctive relief in relation to future conduct "must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future." *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1328 (11th Cir. 2013) (internal quotation marks omitted).  This requires the patients to establish "a real and immediate – as opposed to a merely conjectural or hypothetical – threat of future injury." *See id.* at 1334 (internal quotation marks omitted).  To establish such a threat, each patient must show that (1) there is a "real and immediate" likelihood that he or she will return to the facility and (2) he or she "will likely experience a denial of benefits or discrimination" upon their return. *See McCullum* [*v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1145-46 (11th Cir. 2014)].

*Silva*, 856 F.3d at 832.  Due to Spann's death, and the lack of averments that the Detention Center will confine her in the future, Dudley cannot establish a real and immediate likelihood of confinement in the facility.  Therefore, to recover a remedy on the disability claim – i.e., monetary damages – Dudley must demonstrate that Singleton intentionally discriminated against Spann.

## B.  Dudley's Amended Complaint Fails to Plausibly Aver ADA and RA Claims for Monetary Damages

Dudley fails to sufficiently allege that Singleton intentionally treated Spann differently because of his disability.  As alluded previously, an ADA Title II or RA intentional discrimination claim requires the following elements:

> "Deliberate indifference," we have said, is an "exacting standard."  [*J.S., III by & through J.S. Jr. v. Hous. Cty. Bd. of Educ.*, 877 F.3d 979, 987 (11th Cir. 2017)).]  It requires proof that "the defendant knew

45

that harm to a federally protected right was substantially likely and . . . failed to act on that likelihood." *Liese*, 701 F.3d at 344 (citation omitted). Moreover, in order to hold a government entity liable, the plaintiff must demonstrate that an "official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [entity's] behalf" had "actual knowledge of discrimination in the [entity's] programs and fail[ed] adequately to respond." *Id.* at 349 (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998)).   To qualify, that "official" must be "high enough up the chain-of-command that his [or her] acts constitute an official decision by the [entity] not to remedy the misconduct." *J.S.*, 877 F.3d at 987 (internal quotation marks omitted).

*Silberman*, 927 F.3d at 1134.

As an initial matter, the Amended Complaint fails to demonstrate that Carlton and Dison intentionally discriminated against Spann.   Dudley alleged that Carlton and Dison did not allow Spann to leave his cell, but they did allow other inmates who did not suffer from bipolar disorder, and who did not display acute mental distress, to leave their cells.   As the court previously determined, Dudley did not plausibly allege Carlton and Dison treated Spann differently on the basis of his mental health condition, so Dudley's same contention vis-à-vis the Title II and § 504 claims warrant dismissal.

In addition, Dudley has not plausibly alleged that an official with authority – that is, one "high enough up the chain-of-command that his or her actions 'constitute an official decision by the entity itself not to remedy the misconduct" – knew of Carlton and Dison's alleged failure to accommodate (or even any intentional discrimination, for that matter) and failed to adequately respond to the discrimination. *Id.* at 1135 (citations

46

and internal alterations omitted).   To be sure, there should be some official who failed to follow up on the nurse's order that Spann occupy a cell with a camera.   Yet, Dudley does not allege that Singleton himself knew of Spann's circumstances, and she has not sued any other employee besides Carlton and Dison as to the alleged transgression.

So the case proceeds with the only officials who are parties to the action: Carlton and Dison.   However, Dudley has not plausibly averred Carlton and Dison are "high enough up the org chart to permit a reasonable inference that, through their actions, they speak for [Singleton in his official capacity]." *Id.* at 1135.   Further elaboration of the applicable standard elucidates this assessment:

> To be clear, it's not enough that one be an "official" in the abstract – which is to say, potentially any employee. *Liese*, 701 F.3d at 349.   Rather, "the official [must] have the knowledge of *and authority* to correct an entity's discriminatory practices." *Id.* (emphasis added).   Bus drivers – akin to what the First Circuit has called "line employee[s]," *Gray v. Cummings*, 917 F.3d 1, 17 (1st Cir. 2019) – just don't fit that bill. *See also Doe v. Sch. Bd. of Broward Cty., Fla.*, 604 F.3d 1248, 1255 (11ᵗʰ Cir. 2010) (holding that "janitorial supervisor was plainly not high enough up the chain-of-command" to impose liability on a school district).
>
> To be sure, an "official" needn't be so high up the chain of command that she is "authorized to set an entity's policy." *Liese*, 701 F.3d at 349-50.   But she must be high enough that her actions "constitute an official decision by the [entity] itself not to remedy the misconduct." *Doe*, 604 F.3d at 1255 (internal quotation marks and citation omitted).   That, we have said, requires "substantial supervisory authority." *Liese*, 701 F.3d at 350.

*Silberman*, 927 F.3d at 1135 (alterations and emphasis in original).   Dudley has not averred that Carlton and Dison sustained authority to correct the Lauderdale County

Sheriff's Department's policies or exercised substantial supervisory authority such that their actions constituted official decisions by Singleton in his official capacity.   Rather, the Amended Complaint portrays that Carlton and Dison are jailers under the employ of Singleton who exercised guard duties at the Detention Center.

In summary, Dudley's Amended Complaint fails to aver plausible ADA and RA claims, and thus the court will dismiss those claims along with Dudley's 42 U.S.C. § 1983 claim regarding the alleged violations of the ADA and RA.

### CONCLUSION AND ORDER

Based on the foregoing, the court **PARTIALLY GRANTS** and **PARTIALLY DENIES** Carlton and Dison's motion to dismiss.   The court **DISMISSES** Dudley's Due Process claim regarding Spann's suicide, but Dudley's Due Process claim regarding inadequate mental health care will proceed to discovery.   The court also **DISMISSES** Dudley's Equal Protection claims.

The court **GRANTS** Singleton's motion to dismiss in its entirety.

**DONE** and **ORDERED** this 17th day of December, 2020.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE

48